THORNTON (LEE v.). See Case No. 8,203.

THORNTON (MADDOX v.). See Case No. 8,935.

---

## Case No. 13,999.

### THORNTON et al. v. O'NEALE.

[1 Cranch, C. C. 269.] [1]

Circuit Court, District of Columbia. Dec. Term, 1805. [2]

MUNICIPAL CORPORATIONS—PUBLIC LOTS IN WASH-
INGTON—RESALE—CHARGE TO PURCHASER.

Under the act of Maryland of 1793, c. 58, § 2 [Laws 1791–98], the commissioners of the city of Washington had a right to resell the public lots as often as a purchaser should fail to pay for them, and charge each preceding purchaser with the loss upon the resale.

Assumpsit, against the maker of a promissory note, indorsed by Bazil Wood, as surety, and given to the plaintiffs [Thornton & White, commissioners of the city of Washington], to secure the purchase-money of lots No. 1 and 2, in the square No. 107, in the city of Washington, dated August 6, 1800. The lots had been purchased of the commissioners by Morris & Greenleaf on the 24th of December, 1793, among many others, amounting in the whole to 6000 lots; but having failed to pay the whole of the purchase-money, these two lots were sold again by the commissioners, under the act of assembly of Maryland, 1793, c. 58, § 2, for the default of Morris & Greenleaf. The defendant [William O'Neale] became the purchaser at the price of 216 dollars, and gave his note therefor on the 6th of August, 1800; the amount then due from Morris & Greenleaf for those two lots being 71 dollars and twenty-four cents. The act of Maryland, 1793, c. 58, § 2, under which this sale was made, is in these words: "That on sales of lots, in the said city, by the said commis-

---

[1] [Reported by Hon. William Cranch, Chief Judge.]

[2] [Reversed in 6 Cranch (10 U. S.) 53.]

sioners, or any two of them, under terms or conditions of payment being made therefor at any day or days after such contract entered into, if any sum of the purchase-money or interest shall not be paid for the space of thirty days after the same ought to be paid, the commissioners, or any two of them, may sell the same lots at public vendue, in the city of Washington, at any time after sixty days' notice of such sale, in some of the public newspapers of Georgetown and Baltimore town, and retain in their hands sufficient of the money produced by such new sale to satisfy all principal and interest due on the first contract, together with the expenses of the advertisement and sale; and the original purchaser, or his assigns, shall be entitled to receive from the said commissioners, at their treasury, on demand, the balance of the money which may have been actually received by them, or under their order, on the said second sale; and all lots so sold shall be freed and acquitted of all claim, legal and equitable, of the first purchaser, his heirs and assigns." These powers and duties of the commissioners of the city of Washington were afterwards by an act of congress transferred to a superintendent, and the act of congress of 1st May, 1802, c. 41, § 6 (2 Stat. 176), directs the superintendent to sell all the lots which were sold before the 6th of May, 1796, "and which the commissioners are authorized to resell in consequence of a failure on the part of the purchasers to comply with their contracts." The defendant had failed to comply with his contract for the purchase of these two lots, and the superintendent sold them to Andrew Ross on the 2d of September, 1802, for eighty dollars, and at the request of Ross conveyed them to James Moore on the 17th of September, 1802, having received the purchase-money, namely, 80 dollars, which the superintendent passed to the credit of Morris & Greenleaf, on account of their purchase of the six thousand lots, and then brought this suit in the name of the former commissioners, to whom the note was payable, intending to recover from the defendant the difference between the amount which he agreed to pay for the lots, and the price for which they were sold to Ross. The deed from the superintendent to Moore stated the default to be in Morris & Greenleaf, in not paying for the six thousand lots, and says nothing of the sale to the defendant O'Neale.

Upon this state of facts, Mr. Morsell, Mr. Jones, and P. B. Key, for defendant, prayed the court to instruct the jury, that the plaintiffs could not recover upon this note. 1. That the commissioners had an election to take their remedy in personam, or in rem, but could not pursue both; and that by the sale of the lots they made their election, and abandoned their remedy against the person. 2. That the superintendent had no right to sell to Ross; but having done so, and conveyed away the title, they had abandoned the con-

tract with O'Neale, and had treated it as a nullity. 3. That the sale to O'Neale was conditional, with power in the commissioners to resell and vacate the contract. 4. That the contract was void by the statute of frauds, because there was no note, nor memorandum of the agreement in writing, and therefore there was no consideration for the note.

1. The commissioners had an election of remedies. When a man has an election he cannot pursue both. If a mortgagee brings ejectment and recovers possession of the land, he cannot afterwards sue for the debt. So, if a landlord distrain for rent, he cannot have an action of debt. So, if a person having a rent charge, distrain, he cannot have a writ of annuity. So, if a man brings his action at common law, he waives his remedy by statute. 2 Inst. 200. 2d. The superintendent had no right to sell to Ross. A special authority, in derogation of the common law, must be construed strictly. The superintendent had only authority, by the act of 1 May, 1802, to sell lots which were sold before the 6th of May, 1796, "and which the commissioners were authorized by law to resell in consequence of a failure on the part of the purchasers to comply with their contracts." The only authority which the commissioners had to resell lots for the default of the first purchaser, was under the act of Maryland, 1793, c. 58, § 2. That act only authorizes one resale of the same lot, and the proceeds of such "new sale" are to satisfy the principal and interest due on the "first contract," and the "original purchaser" is to receive the surplus, if there should be any, on the "second sale," and the lots resold are to be free of all claim, legal or equitable, of the "first purchaser." The legislature intended that the second sale should be for cash. The act does not authorize them to sell on credit, but if it does, the whole proceeds of the third sale are to go to the credit of the first purchaser, so that the intermediate purchaser is to derive no benefit from the enhanced price. With what justice, then, can he be made responsible for the loss on the third sale? The commissioners cannot withdraw the consideration and yet hold the defendant to the contract. They cannot vacate the contract as to themselves, and yet hold the defendant bound. 3d. The commissioners themselves have considered and treated it as a conditional sale, and as having a right to vacate it if the purchase-money should not be punctually paid; and they cannot now deny it. 4th. It is void by the statute of frauds. The memorandum by the clerk of the commissioners, who acted as auctioneer, is not such a note in writing as the statute requires. It must be such a writing as will bind the party. It must be delivered. If it was not such a writing as the plaintiffs were bound to perform, it cannot bind the defendant. 1 Bac. Abr. 115, tit. "Annuity," C, "St. Frauds"; Whitchurch v. Bevis, 2 Brown, Ch. 559; Hawkins v. Holmes, 1 P. Wms. 770, 771; 7 Bac. Abr.

(Gwillim) tit. "Agreement"; Cooke v. Tombs, Anstr. 420. Giving the note for the purchase-money was not such a part performance as will take the case out of the statute of frauds. 1 Bac. Abr. 121 tit. "Agreement," C.

Mr. Mason, contra. 1. The statute of frauds does not affect the consideration of the note. The receiving of the notes was in part execution of the contract. The advertisement of the terms of sale was signed by the commissioners. The lots were sold at auction, and the price of the lots, and the name of O'Neale as the purchaser, were entered in the sales-book by the clerk of the commissioners. 2. The commissioners were public agents with delegated powers. Their acts, within those powers, were valid. But if they exceeded their powers, their acts are void, and the public are not bound by them. The public are not estopped by their admissions or concessions or constructions. Their disposition of the proceeds of the sale cannot affect their right to sell. Their power extended to all sales on credit, past, present, or future. They had an unquestionable right to sell the lots to O'Neale. The contract with him was valid. There was a good consideration for the note when it was given. The equity of Morris & Greenleaf was gone by the sale, even before the money was paid. The commissioners were not bound to sell for cash; nor to give credit to Morris & Greenleaf for the amount of the sales until actually received by them. Morris & Greenleaf lost their equitable title to the lots, but in lieu thereof, were entitled to the surplus arising upon the second sale. The commissioners held it as their trustees, and could not release O'Neale from his bargain, but were bound to enforce it for the benefit of Morris & Greenleaf.

The act of Maryland, 1793, c. 58, § 2, did not give any new security. It only hastened the remedy, by substituting a resale for the ordinary decree in chancery for the sale of the land, when the purchaser has failed to pay the purchase-money; and under such a decree, the trustee would have no power to rescind his sale, but would be bound to enforce it for the benefit of the first vendee. It is true that if a mortgagee forecloses the mortgage, and obtains possession, it is satisfaction, but not if the decree be for the sale; for in that case the mortgagor remains liable for the deficit, and is entitled to the surplus. The act does not limit the commissioners to one of two remedies. They may pursue both until they obtain satisfaction. It did not mean to deprive them of any benefit which they had before. If the commissioners had no authority to sell the lots to Ross, the sale to him was void, and O'Neale may still compel the commissioners to convey them to him. Morris & Greenleaf had a right to the surplus arising on the sale to O'Neale, and O'Neale would have a right to the surplus beyond the amount due from him, if any had arisen upon the sale to Ross. Being entitled to the surplus, if any, he must submit to the loss.

THE COURT refused to give the instruction prayed by the defendant's counsel.

. CRANCH, Circuit Judge, contra. O'Neale would not have been entitled to the surplus, if there had been any, on the sale to Ross, and therefore ought not to be liable for the deficit. That is, as he would not have been entitled to the difference between what he agreed to pay to the commissioners for the lots, and what they would have received from Ross, if they had sold to Ross for a greater sum than O'Neale had agreed to give; the plaintiffs have no right to charge the defendant with the difference in the present case. The counsel for the plaintiffs has contended that O'Neale would have been entitled to the surplus, if any, and therefore he is liable for the deficit. If O'Neale would have been so entitled, the case would stand thus: Suppose the 1st sale to Morris & Greenleaf was for $100, the sale to O'Neale for $50, the sale to Ross for $150, which last sum the plaintiffs have received, what then would be the rights of the parties? O'Neale would be entitled to receive $100, and the act of 1793 says the commissioners shall retain the amount due from the first purchaser, Morris & Greenleaf, $100; which make $200. But the whole sum is only $150, which shows it to be impossible that such should be the rights of the parties. Then the right of O'Neale or of the commissioners must be withdrawn. But the right of the commissioners to retain $100 due from Morris & Greenleaf, is supported by the express words of the act of 1793. The right of O'Neale is only supported by implication and analogy. The impossibility that both rights can exist at the same time, totally destroys that implication. The right of O'Neale to the surplus, therefore, cannot exist; it must yield to the superior right of the commissioners. The ground, therefore, on which the plaintiffs' counsel relies, is gone.

The question then, is, whether the plaintiffs can recover on the notes, if O'Neale would not have been entitled to the surplus, if there had been any, on the sale to Ross? The notes were given for the purchase of lots, which lots the plaintiffs have sold to others since the notes became payable. It is true the notes were originally given on a valuable consideration, viz., the plaintiffs' promise to convey the lots on payment of the money. After the default of the defendant in not paying the notes, the plaintiffs were no longer bound to convey the lots; they had then a right to disaffirm the agreement, and the defendant, on tendering the money after the day of payment, could not recover damages at law against the plaintiffs for not conveying the lots. The plaintiffs had a right to release the defendant from the contract. Have they done so? If they have not at law, they clearly have in equity. If O'Neale is not entitled to the

benefit of the sale to Ross, and the plaintiffs are entitled to recover upon the notes, they are entitled to recover the whole sum. But if they should recover judgment at law, the defendant would enjoin the judgment in equity; and upon showing that the plaintiffs at law had sold the property to another and received its value, equity would decree that the money arising from the sale, should go in discharge of the notes. The sale by the plaintiffs to Ross, was either in affirmance or in disaffirmance of their sale to the defendant. If it was in affirmance, then the sale to Ross was at the risk and for the benefit of the defendant. And if the sale in this case was at the risk of the defendant, it would have been for his benefit, if the sale had produced more than his notes. The principle must be the same in both cases. There can be no middle principle which can make him liable for the loss, and not give him the chance of gain. If there had been a surplus on the sale to Ross, there is no principle by which the defendant could be credited for no more than the amount of his notes. But I have shown that the defendant could not by law receive the benefit of the sale to Ross. Hence the sale to Ross cannot be considered as in affirmance of the contract with the defendant. It must, therefore, be in disaffirmance of that contract. But the plaintiffs must be consistent throughout. They cannot disaffirm for the purpose of selling the lots to Ross, and at the same time affirm it by holding the defendant liable on his notes. The resale, authorized by the act of 1793, is in affirmance of the contract of sale to the first purchaser. The lots are resold, not as the property of the commissioners, but of the first purchaser. So on a bill in chancery by a vendor of land, praying for a sale of the land to satisfy the purchase-money due from the vendee to the vendor, such a decree and such a sale are made in affirmance of the first contract; and the land is sold under the decree, not as the land of the vendor, (the complainant in equity,) but of the vendee. Such decrees are grounded on the idea that the vendor has a specific lien only on the land, like a mortgage, and that the vendee is entitled to the benefit of the increased value of the thing sold, if its value has increased, and liable for its depreciation, if its value has been diminished. It is founded on the principle, that by the contract, the right to the land is transferred to the vendee, and the right to the purchase-money to the vendor. Hence it was just and equitable, that, on the resale by the commissioners, (which by the act of 1793 is substituted for a resale under a decree in chancery,) the surplus, after retaining the amount of the first purchase-money, should be paid over to the first purchaser.

It is important to bear in mind, that when the commissioners resell a lot under that act of assembly, they do not sell it as their

own property, but as the property of the first purchaser. They act as his agents or trustees. and not in their own right. But the act of assembly was made for the sole benefit of the commissioners, as agents of the public, and to enable them to collect the public money. It was not intended to apply to sales made by individuals; it meant to embrace those sales only which the commissioners should make as agents for the public, and not those which they might make as the agents or trustees of an individual. The act of assembly operates merely as a statutory decree for the resale of all lots sold by them as agents for the public, upon default being made by the first purchaser, and it is only for his default, and to satisfy his debt to the public. The commissioners, for this purpose, stand in the place of a trustee appointed to sell under a decree in chancery. The act of assembly does not say whether the resale shall be for cash, or on credit; nor does it expressly leave that matter to the discretion of the commissioners. But as the object of the act is to raise money from the resale of the lots, and as the act does not authorize a resale, but for the default, and as the property of the first purchaser, it is a fair inference, that they were obliged to sell for cash; or, that if they resold on credit, the resale was to be considered void, unless the money was duly paid, according to the terms of such resale.

The act authorized them to sell only the property of the first purchaser. Upon the fault of the second purchaser, the commissioners could not sell to a third purchaser without considering the second sale as void; because, as they were only authorized to sell the right of the first purchaser, and as they had once sold that, there was nothing left for them to sell while the second sale remained valid. Again, the parties to the second sale had certainly a right by mutual assent to dissolve the contract. The commissioners have given the most unequivocal evidence of such assent on their part, because they have done that act which they could not lawfully do while that contract remained in force. They have sold and conveyed to another the very subject-matter of the contract. No written instrument, no solemn specialty, could more clearly demonstrate its dissolution. The assent of the defendant to the same dissolution was evidenced (prior to that of the commissioners) by his refusal to pay the notes. By that act he waived the contract, and at law could never insist upon its performance. His assent is further testified by the present defence which he now sets up.

The commissioners, having no right to sell for the default of O'Neale, and having no right to sell the lots as the property of O'Neale, but having sold for the default of Morris & Greenleaf, and as their property, (for whose default and as whose property only they were authorized by the act to sell)

have completely disaffirmed the contract with O'Neale; and, having done so, they must act consistently throughout: the disaffirmance goes back to the inception of the contract, and prevents them from saying there was any consideration for the notes at the time they were given.

Verdict and judgment for the plaintiffs.

Reversed by the supreme court of the United States. 6 Cranch [10 U. S.] 53.